# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MITCHELL FERNANDORS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  02-2001 (JDB)** |
| **DISTRICT OF COLUMBIA, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Mitchell Fernandors brings this action against the District of Columbia, Metropolitan Police Department ("MPD") Officers William Washington, Jr. ("Officer Washington"), Andres Marcucci, Jr. ("Officer Marcucci"), Henry Allen ("Officer Allen"), Eric Fenton ("Officer Fenton"), and Howard Howland ("Officer Howland"), and a number of unnamed MPD officers (collectively "defendants") for violations of the Fourth and Fifth Amendments to the Constitution and a number of common law torts.  Plaintiff's claims arise out of an alleged strip search and arrest of him that was conducted by MPD officers in 2001. Defendants now move for partial summary judgment.[1] For the following reasons, the Court will grant in part and deny in part defendants' motion for partial summary judgment.

---

[1]  Defendants conceded at the June 15, 2004 motions hearing that there were genuine issues of material fact in dispute on plaintiff's Count I Fourth Amendment claims against Officers Allen (search and arrest) and Washington (arrest only).  Plaintiff also voluntarily dismissed his Fourth and Fifth Amendment claims against the MPD supervisors (counts II & VI), and his claims pertaining to Officer Marcucci.

## BACKGROUND

On October 10, 2001 plaintiff bought a single cigar from a convenience store in the area of Fourth Street and Rhode Island Avenue in Northeast Washington, D.C.  See Defendants' Statement of Material Facts As To Which Defendants Contend There Is No Genuine Issue ("Defs.' Statement") ¶ 1.  Plaintiff then went to a nearby bus stop and removed the tobacco from inside the outer wrapping of the cigar.  Id. ¶ 2.  While plaintiff was waiting at the bus stop, and unwrapping the cigar, two masked men emerged from a nearby car and approached plaintiff.  See Pl. Opp'n, Ex. A, Deposition of Mitchell Fernandors ("Fernandors Dep.") at 57.  These two men grabbed plaintiff, and one of them snatched the cigar out of plaintiff's hand and knocked it to the ground.  Id. at 58.  These men were District of Columbia police officers who are defendants in this action, Officers Washington and Allen.  The police officers determined that the cigar did not contain any marijuana.  See Pl. Opp'n, Ex. C, Affidavit of Mitchell Fernandors ("Fernandors Aff.") ¶ 7; Pl. Opp'n, Ex. A, Deposition of William Washington ("Washington Dep.") at 8-9; Pl. Opp'n, Ex. A, Deposition of Harry Allen ("Allen Dep.") at 29.  After plaintiff was frisked for contraband, he was pushed against a nearby fence, handcuffed behind his back and placed on the ground.  See Fernandors Dep. at 59-64.  The officers then searched and emptied plaintiff's pockets.  See Allen Dep. at 12.

Officer Allen then retrieved a pair of latex gloves and plaintiff was stood up.  See Fernandors Dep. at 69.  Other officers at the scene surrounded plaintiff by "standing shoulder to shoulder so the public couldn't see the type of search that they were [doing] on [plaintiff] out in public."  Id. at 74, 92.  The specifics of the search are in dispute, but according to plaintiff, Officer Allen loosened plaintiff's pants and looked down them with the use of a flashlight.  Id. at

70.  Officer Allen then put his hands down plaintiff's pants, and touched plaintiff's genitalia.  Id.

at 70-75.  Finally, Officer Allen looked down the "backside" of plaintiff's pants.  Id. at 76.

According to Officer Allen, he merely pulled plaintiff's pants open and looked down them for

weapons.  Allen Dep. at 40, 48.

After the search, plaintiff alleges, the police found an open container of alcohol nearby.

See Fernandors Dep. at 78.  Subsequently, plaintiff was charged with possession of an open

container of alcohol ("POCA"), and taken to a police station.  Id. at 94-97.  According to Officers

Allen and Washington, they witnessed plaintiff holding the open can of beer.  See Allen Dep. at

29; Washington Dep. at 8.  Plaintiff was held at the police station for a few hours and released in

the early morning hours of October 11, 2001.  See Fernandors Aff. ¶ 10.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."  Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer

"evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252; see also

Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## ANALYSIS

Defendants move for summary judgment on a number of grounds.  They argue that

plaintiff's common law claims must be dismissed as time barred, that plaintiff has failed to

establish an equal protection claim against the individual defendants or the District of Columbia,

that the individual officers are entitled to qualified immunity on constitutional claims, and that

plaintiff has failed to establish municipal liability against the District of Columbia.

## I.    Statute of Limitations

Defendants contend that plaintiff's common law claims for assault, false arrest,

intentional infliction of emotional distress and privacy are barred by the statute of limitations,

noting that the search and arrest that gave rise to these claims occurred on October 10, 2001, but

plaintiff did not file his complaint until October 11, 2002, one day beyond a one-year statute of

limitations.  See Def. Mot. at 18-19.  In response, plaintiff argues that he was in police custody

until October 11, 2001, and therefore his right of action did not accrue until October 11, 2001,

making his October 11, 2002 Complaint timely.  Id.

This issue is governed by D.C. Code § 12-302(a)(3), which provides that when a person is "imprisoned" at the time the right of action accrues, then that person "may bring action within the time limit after the disability is removed."  In order to toll the limitations period, plaintiff's tort action must have accrued at the time of his imprisonment.  For an action that accrues during an arrest, D.C. Code § 12-302 tolls the statute of limitations during the time of any imprisonment resulting from that arrest.  See District of Columbia v. Tinker, 691 A.2d 57, 64-65 (D.C. 1997) (on an excessive force claim arising out of an arrest, "there is no dispute that the statute was tolled by section 12-302(a)(3) from the moment of [plaintiff's] arrest"); McClam v. Barry, 697 F.2d 266, 371 (D.C. Cir. 1983), overruled on other grounds in Brown v. United States, 742 F.2d 1498 (D.C. Cir. 1984).  Only upon a prisoner's release from that arrest does the statute of limitations begin to run again.  See Simpson v. D.C. Metropolitan Police Dep't, 789 F. Supp. 5, 8 (D.D.C. 1992) ("release from incarceration removes the toll and commences the running of the statute").

In this case, there is no dispute regarding the facts on this issue.  Plaintiff was searched and arrested on October 10, 2001 and hence at the time of the search and arrest his common law tort claims accrued.  Plaintiff was also held at the police station until the early morning hours of October 11, 2001.  Therefore, under § 12-302(a)(3) and the case law interpreting it, the statute of limitations for plaintiff's tort claims was tolled until October 11, 2001, and plaintiff's complaint filed on October 11, 2002 is timely.  Although defendants suggest that plaintiff's few hours in police custody do not constitute "imprisonment" for purposes of § 12-302(a)(3), the statutory text does not contain a de minimis exception, nor is there any case law to support defendants' position

that a few hours in jail does not constitute imprisonment.  Instead, the term "imprisonment"

should be given its ordinary meaning -- "the act of putting or confining a man in prison."  See

Rose v. Washington Times Co., 23 F.2d 993, 994 (D.C. Cir. 1928) (interpreting a precursor to

D.C. Code § 12-302(a)(3)).  Plaintiff was "imprisoned" by the MPD until October 11, 2001, and

therefore the statute of limitations on his tort claims did not run until October 11, 2002, and this

action is timely.

## II.    Equal Protection

Plaintiff alleges that the District of Columbia and the individual officers involved in his

search and arrest violated his Fifth Amendment right to equal protection of the laws.  To

establish an equal protection claim against these defendants, plaintiff must show that he was

singled out by police from among others similarly situated on the basis of his race.  See Branch

Ministries v. Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000).  An allegation of racial discrimination

in violation of the Constitution's guarantee of equal protection cannot survive unless the plaintiff

establishes that the defendant acted with discriminatory intent. See Washington v. Davis, 426

U.S. 229, 241 (1976) (finding that a showing of discriminatory purpose is necessary to bring a

claim of racial discrimination under the equal protection component of the Due Process Clause of

the Fifth Amendment or under the Equal Protection Clause of the Fourteenth Amendment).

Furthermore, the plaintiff must show that the decision-makers in plaintiff's particular case were

motivated by discriminatory purpose.  See McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

Defendants move for summary judgment arguing that plaintiff has not put forth any

evidence into the record that the officers in question were motivated by considerations of race.  In

examining the record, the Court agrees with defendants' assessment, as plaintiff has not presented

any direct evidence that would support an inference that racial considerations motivated the police officers who searched and arrested him.  The only evidence presented by plaintiff is his own beliefs and experiences with the police.  Where there is no direct evidence of discriminatory intent, courts have allowed plaintiffs to present statistical evidence to establish an inference of discriminatory motive.  See McCleskey, 481 U.S. at 293-94 (discussing use of statistical evidence in equal protection claims).  Here, however, plaintiff does not have any statistical evidence that would establish a pervasive pattern of race-based unconstitutional strip searches or arrests.[2]  In fact, plaintiff's evidence consists entirely of a few other encounters that plaintiff had with the police, newspaper articles, and a Report of the Citizen Complaint Review Board.

Plaintiff's evidence is not sufficient to create a genuine issue for the jury.  Plaintiff alleges that he had three other encounters with police officers besides the incident in this case: at some time plaintiff was arrested by transit officers for jumping a turnstile, see Fernandors Dep. at 13-14, 135-38; around August 2003 plaintiff was searched and arrested for disorderly conduct, see id. at 16-21; and around October 2004 plaintiff was handcuffed, searched, but not arrested as part of a police investigation into a shooting, see Pl. Supp. Opp'n at 1-2.  However, this evidence does not establish a pattern of activity by MPD officers that would permit an inference of discriminatory motives.  Plaintiff does not provide the details of these incidents so that it could be shown that these were unlawful encounters, nor do these incidents purport to show the police were acting out of racial animus.

---

[2]  Plaintiff notes that he does not have statistical evidence because MPD does not keep adequate data on strip searches by race.  See Pl. Opp'n at 32-33.  However, at the motion hearing plaintiff's counsel conceded that he did not believe the lack of data should create an inference or presumption against defendants.

Plaintiff's other evidence is equally unavailing. Not only is the newspaper article cited by plaintiff hearsay, but the article does not mention at all discriminatory motives by police in searches and arrests. See Pl. Opp'n, Ex. E. The Report of the Citizen Complaint Review Board, also cited by plaintiff, does not contain any evidence or suggestion of discriminatory motives by police officers in strip searches or arrests. See Pl. Opp'n, Ex. H, Report of the Citizen Complaint Review Board. Finally, plaintiff argues in his supplemental opposition that the Court should consider the lack of training and police supervision over strip searches as evidence of racial animus, see Pl. Supp. Opp'n at 2, but the focus of plaintiff's equal protection claim must be evidence of discriminatory motive by the police, and like the other evidence offered by plaintiff, this evidence simply does not address racial animus. Effectively, plaintiff's only evidence of racial animus is the fact that plaintiff is an African-American and plaintiff believes that he was searched and arrested because of his race. Plaintiff's unsubstantiated beliefs are, quite simply, inadequate to create a genuine dispute over a material fact, and therefore defendants are entitled to summary judgment on both of plaintiff's equal protection claims. See Celotex, 477 U.S. at 322.

## III.    Qualified Immunity

It is well settled that government officials such as the individual defendants in this case enjoy a qualified immunity from constitutional and statutory claims against them. See, e.g., Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Anderson v. Creighton, 483 U.S. 635, 640 (1987); Cleavinger v. Saxner, 474 U.S. 193, 206 (1985); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The basic standard for a qualified immunity analysis is explained in Harlow:

> government officials performing discretionary functions generally are shielded
> from liability for civil damages insofar as their conduct does not violate "clearly
> established" statutory or constitutional rights of which a reasonable person would
> have known.

457 U.S. at 818.  The defendant's subjective good faith is not relevant to the qualified immunity analysis.  Id. at 815-18.  In making this assessment, the Supreme Court said a right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  On the other hand, an official is not shielded from liability where he "could be expected to know that certain conduct would violate statutory or constitutional rights."  See Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir.1998).

In Siegert v. Gilley, 500 U.S. 226 (1991), the Supreme Court further clarified "the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity."  Id. at 231.  Stressing the *threshold* nature of the qualified immunity inquiry, the Court observed as follows:

> A necessary concomitant to the determination of whether the constitutional right
> asserted by a plaintiff is "clearly established" at the time the defendant acted is the
> determination of whether the plaintiff has asserted a violation of a constitutional
> right at all.

Id. at 232.  The Supreme Court has elaborated further on this essential two-step qualified immunity inquiry, and has stressed the importance of lower federal courts considering "the requisites of a qualified immunity defense" in what the Court identified as the "proper sequence":

> the first inquiry must be whether a constitutional right would have been
> violated on the facts alleged; second, assuming the violation is established,
> the question whether the right was clearly established must be considered . . . .

Saucier v. Katz, 533 U.S. at 200; accord, Lederman v. United States, 291 F.3d 36, 46 (D.C. Cir.

2002).  This initial assessment of the "existence or nonexistence of a constitutional right" was necessary to enable development of the law so that courts can later assess whether a right is clearly established.  Id. at 201.  The Saucier Court identified this threshold inquiry precisely: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201 (citing Siegert v. Gilley, 500 U.S. at 232).

### A.   Arrest

We turn first, then, to plaintiff's claim against the individual defendants based on a Fourth Amendment violation for an unlawful arrest.  In asserting the defense of qualified immunity, defendants concede that Officers Allen and Washington do not have qualified immunity on plaintiff's unconstitutional arrest claim at this time because there is a genuine factual dispute as to whether plaintiff actually had the open container of alcohol.  However, defendants argue that Officers Fenton and Howland are entitled to qualified immunity because they were not involved in the arrest of plaintiff.  In response, plaintiff concedes that Officer Howland was not part of plaintiff's arrest.  Therefore, the only question for the Court is whether Officer Fenton's alleged conduct violated plaintiff's clearly established constitutional rights so that he would not have qualified immunity.

Following the direction of the Supreme Court in Saucier, the first step for this Court is to assess whether plaintiff has established that Officer Fenton violated his constitutional rights.  A claim for false arrest under the Fourth Amendment may be established upon a showing that there was no probable cause to support a plaintiff's warrantless arrest and detention.  See Pierson v. Ray, 386 U.S. 547, 555 (1967). Probable cause to arrest exists when the facts and circumstances

are sufficient to warrant a prudent person to believe that the individual has committed an offense. See Gerstein v. Pugh, 420 U.S. 103, 111 (1975); United States v. Wesley, 293 F.3d 541, 545 (D.C. Cir.2002) (probable cause when "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense").

There are two ways in which plaintiff may establish an unlawful arrest claim against Officer Fenton.  First, plaintiff can show that Officer Fenton was directly involved in the arrest without probable cause, and therefore is liable for the constitutional violation.  Alternatively, plaintiff can establish that Officer Fenton is liable under a theory of bystander liability.  Under the bystander theory of liability an officer is held responsible for a constitutional violation if he: (1)  knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  See Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002); Masel v. Barrett, 707 F. Supp. 4, 7-8 (D.D.C. 1989) (recognizing constitutionally based police officer affirmative duty).

Plaintiff's general allegation is that the officers at the scene contrived the POCA violation to justify the arrest.  According to plaintiff, he did not have an open container of alcohol in his possession, and the MPD officers fabricated that evidence to justify the arrest.  The threshold question for Officer Fenton's defense of qualified immunity is whether there are facts in dispute in the record that show Officer Fenton was personally involved in fabricating the POCA violation, or that show he was aware of the fabrication and had an opportunity to stop the arrest. According to plaintiff, Officer Fenton was listed as the arresting officer on the police department Form 163, and was involved in handcuffing plaintiff.  See Pl. Opp'n, Ex. A, Eric Fenton

Deposition ("Fenton Dep.") at 9, 14, 28-29. Plaintiff also alleges that there are two key facts in

dispute that would go to whether Officer Fenton was aware of any POCA fabrication.  First,

plaintiff suggests that the evidence shows Officer Fenton may have been partnered with Officer

Allen the day of plaintiff's arrest.  See Pl. Reply on Bystander Liability at 1 (citing Washington

Dep. at 12).  Second, plaintiff contends there is dispute as to when Officer Fenton arrived at the

scene, so that he may have known of the fabrication.  See id. at 1-2.

     The evidence in the record supports defendants' position that Officer Fenton was not

involved in or aware of any alleged fabrication.  Office Fenton testified during a deposition that

he did not investigate whether the beer in question actually belonged to plaintiff.  See Fenton

Dep. at 22.  In fact, at his deposition he referred plaintiff's counsel to Officer Allen for any

question regarding how it was determined that plaintiff possessed the open container.  Id.  It

would be one thing if Officer Fenton testified that he saw the plaintiff with the beer can, as that

would put Officer Fenton squarely within the area of factual dispute.  However, Officer Fenton

specifically testified that he does not have any direct knowledge of whether the plaintiff actually

possessed the beer can.  Id.  Plaintiff does not have any evidence that contradicts Officer Fenton's

testimony.  It is also not in dispute that Officers Allen and Washington were the first officers on

the scene, and that they initially apprehended plaintiff.  See Fernandors Dep. at 57 (two officers

approached plaintiff); Fernandors Aff. ¶ 7 ("two officers jumped out of the car"); Pl. Opp'n, Ex.

A, William Washington Deposition ("Washington Dep.") at 8.  Officer Fenton testified at his

deposition that he was not the officer who made the determination to arrest plaintiff.  See Fenton

Dep. at 10.  He also testified that he arrived at the scene after Officer Washington, which is

consistent with the testimony of plaintiff and of Officers Allen and Washington.  See id. at 28.  In

short, there is no evidence to show that Officer Fenton was involved in the alleged fabrication of

the POCA charge or that he was even aware of it at the time and therefore plaintiff cannot

establish that Officer Fenton is liable for a violation of plaintiff's Fourth Amendment rights,

either personally or through bystander liability.  And because plaintiff cannot establish a

violation, Officer Fenton is entitled to qualified immunity on this claim.

**B.      Strip Search**

Plaintiff also raises a Fourth Amendment unlawful strip search claim against the

individual officers, and again defendants respond that the individual officers, except Officer

Allen, are entitled to qualified immunity.  The Court must determine whether plaintiff has

established that the individual officers violated his constitutional rights, whether those rights

were "clearly established" at the time of the violation, and whether plaintiff can establish liability

through the officers' direct involvement in the search or their status as bystanders.  In Bell v.

Wolfish, 441 U.S. 520, 559 (1979), the Supreme Court set forth the factors to be utilized in

assessing the reasonableness, i.e., constitutionality, of a strip search: "the scope of the particular

intrusion, the manner in which it is conducted, the justification for initiating it, and the place in

which it is conducted."  Plaintiff makes two separate unreasonable search claims against

defendants.  He contends the initiation of the search was improper because the officers did not

have probable cause to arrest him, and therefore had no basis to conduct the search incident to an

arrest.  Plaintiff also alleges that the search itself -- its manner, place, and scope -- was

unreasonable and violative of the Fourth Amendment.

1.      Initiation of Search

Examining plaintiff's first allegation, the question is whether any of the individual

officers (Washington, Fenton, or Howland) were liable, personally or as bystanders, for the initiation of the strip search of plaintiff.  According to the record, Officer Allen conducted the search incident to the arrest of plaintiff for a POCA violation.  <u>See</u> Allen Dep. at  48 ("I searched him because he was under arrest").  It is also the case that a search of an individual arrested for a minor offense (such as a POCA violation) would violate the Fourth Amendment unless officers "reasonably suspected" the plaintiff possessed contraband.  <u>See</u> <u>Justice v. City of Peachtree City</u>, 961 F.2d 188 (11th Cir. 1992) (search pursuant to an arrest for truancy not unconstitutional when officers had reasonable suspicion suspect was concealing drugs).  Along that line, Officer Allen also stated that given his suspicion plaintiff was "hollow[ing] out a blunt," he believed plaintiff may have had marijuana on his person.  <u>See</u> Allen Dep. at 29.

Because the record shows that Officer Allen alone made the decision to initiate a search of plaintiff, liability for his fellow officers (Washington, Fenton, or Howland) can only be based on bystander liability.  On a theory of bystander liability, the officers are liable if they knew Officer Allen was violating plaintiff's constitutional rights, had an opportunity to stop him, and failed to do so.  <u>See</u> <u>Randall</u>, 302 F.3d at 204.  Therefore, liability for the individual officers turns on whether there is any evidence (or a genuine dispute) that would implicate them in the alleged fabrication of a reason for the arrest or permit them to call into question the reasonable suspicion that plaintiff was concealing drugs on his person.  As discussed above, and conceded by defendants, there is a factual dispute whether Officer Washington had knowledge of the alleged POCA fabrication.  Hence, Officer Washington, with possible knowledge of the alleged fabrication, might have been in a position to prevent the unlawful and pretextual search, and a failure to do so would expose him to liability.  <u>See</u> <u>Masel</u>, 707 F. Supp. at 8-9; <u>O'Neill v.</u>

-14-

Krzeminksi, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.").  It is also true that under the second prong of the Saucier test, it is clearly established that a search in this context cannot be conducted without a valid arrest.  See United States v. Robinson, 414 U.S. 218, 223 (1973) (" It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").  Therefore, the disputed facts relating to the POCA arrest (the only basis for the search) prevent Officer Washington from receiving qualified immunity for this claim at this time.

On the other hand, there is no evidence in the record that Officers Fenton or Howland had any involvement in or knowledge of the alleged fabrication of a reason for arrest, or any basis to challenge the reasonable suspicion that plaintiff had marijuana.  The evidence is clear that Officers Allen and Washington were the first on the scene, see Fernandors Aff. ¶ 7 ("two officers jumped out of the car"),  and Officer Fenton's deposition testimony regarding the open container violation is uncontroverted, see Fenton Dep. at 22.  Furthermore, the evidence is also uncontroverted that Officers Allen and Washington initially searched plaintiff's "black and mild" cigar.  See Fernandors Dep. at 57-58; Fernandors Aff. ¶ 7; Washington Dep. at 8-9; Allen Dep. at 29.  Therefore, without any evidence that Officers Fenton or Howland were involved in or aware of the alleged POCA fabrication, or present for review of plaintiff's cigar, they cannot be held liable as bystanders for the initiation of the allegedly unlawful search.

2.   Manner, Place, and Scope of Search

Plaintiff's second allegation is that the strip search conducted in public was unreasonable under the Wolfish factors.  See Pl. Opp'n at 13.  Under this claim, even if a jury were to find it

was reasonable to conduct a search of plaintiff, the manner of the search would nonetheless be

unreasonable under the Wolfish factors given the location of the strip search as well as the

alleged touching of plaintiff's genitalia by Officer Allen.  Here again, defendants concede at the

summary judgment stage that there are factual disputes as to whether Officer Allen's search was

reasonable.  However, defendants contend that only Officer Allen could be considered liable

because he was the officer who actually conducted the search.  Defendants note that Officers

Washington, Fenton, and Howland merely surrounded plaintiff during the search to insure his

privacy.  See Def. Mem. at 11 ("the search of plaintiff was not conducted until after officers . . .

surrounded [plaintiff]").

        Although defendants downplay the involvement of the other officers, and seek to focus

the attention of the Court solely on Officer Allen, defendants' own arguments indicate the scope

of the other officers' involvement.  In particular, defendants state that the search of plaintiff on

the street was only conducted after the other officers acted as shields for the search.  In doing so,

the officers' involvement would appear to be much more than as mere bystanders.  In fact, other

circuits have found that officers who did not actually conduct a search could still be considered

participants in the search if their activity was "integral to the search."  The Fifth Circuit found

that officers who surrounded a shop, armed, while other officers conducted a search, were

"integral to the search," and therefore were not bystanders, but rather actual participants.  James

v. T.G. Sadler, 909 F.2d 834, 837 (5th Cir. 1990) (citing Melear v. Spears, 862 F.2d 1177, 1186

(5th Cir. 1989)).  Furthermore, in Boyd v. Benton Cty, 374 F.3d 773, 780 (9th Cir. 2004), the

Ninth Circuit held that all officers involved in a search could be liable for an allegedly

unreasonable search, even though only one officer used the complained of "flash bang" device.

The present situation is analogous to that in James, in that the other officers surrounded plaintiff

enabling Officer Allen to conduct the search.  In fact, defendants contend the search did not

occur until after the other officers surrounded plaintiff.  See Def. Mem. at 11.  Therefore, because

Officers Washington, Fenton, and Howland were necessary for the search to occur, they were

integral participants.  And because these officers were participants in the manner of the search of

plaintiff, defendants' concession that qualified immunity is inappropriate at this time for Officer

Allen would seem to be equally applicable for these officers.

**IV.     Fourth Amendment Claims Against the District of Columbia**

Finally, plaintiff seeks to hold the District of Columbia liable for constitutional violations

allegedly committed by its police officers.  Under Monell v. Dep't of Soc. Serv. of the City of

New York, 436 U.S. 658 (1978), a municipality, such as the District, may be held liable under §

1983 "only when the execution of its official policy or custom is responsible for the deprivation

of constitutional rights."  Morgan v. Dist. of Columbia, 824 F.2d 1049, 1058 (D.C. Cir.1987).

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under

Monell, unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy . . . ."  Parker v. Dist. of Columbia, 850 F.2d 708, 711-12 (D.C.

Cir.1988) (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 823-24 (1985)).  To succeed on a §

1983 claim against the District, then, plaintiff must show (1) "a course deliberately pursued by

the city, 'as opposed to an action taken unilaterally by a nonpolicymaking municipal employee,' "

and (2) " 'an affirmative link between the [city's] policy and the particular constitutional violation

alleged.'" Carter v. Dist. of Columbia, 795 F.2d 116, 122 (D.C. Cir.1986) (internal citation

omitted).

The Supreme Court has also explained "that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under section 1983." City of Canton v. Harris, 489 U.S. 378, 387 (1989).  However, proving a failure to train or supervise claim is not easy.  See Atchinson v. Dist. of Columbia, 73 F.3d 418, 421 (D.C. Cir. 1996).  A municipality's failure to train or supervise its employees adequately can constitute a "policy or custom" under Monell only when it can be said that the failure amounts to "'deliberate indifference' towards the constitutional rights of persons in its domain." City of Canton, 489 U.S. at 388-89 & n. 7; see also Rogala v. Dist. of Columbia, 161 F.3d 44, 56 (D.C. Cir.1998) (recognizing liability for failure to train or supervise); Carter, 795 F.2d at 122 (a municipality's failure to adequately train, supervise, investigate, and discipline police officers can give rise to municipal liability if that failure represents city policy and reflects deliberate indifference). Deliberate indifference is determined objectively "by analyzing whether the municipality knew or should have known of the risk of constitutional violations," and yet failed to respond as necessary.  Baker v. Dist. of Columbia, 326 F.3d 1302, 1307 (D.C. Cir. 2003).  The D.C. Circuit in Rogala summarized the exacting standard for municipal liability in a failure to supervise or train case:

> For suits alleging failure to train or supervise, plaintiffs must also establish that the need for more or different training or supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights that policymakers can be said to have been deliberately indifferent to the need.

161 F.3d at 56.

The Supreme Court has identified certain instances that would support a claim for failure to train or supervise.  See Canton, 489 U.S. at 390 n.10.  One such instance is where the risk of constitutional violations is obvious -- such as training officers on the constitutional limitations on

the use of deadly force.  Id. (citing Tennessee v. Garner, 471 U.S. 1 (1985)).  Another instance that would establish municipal liability for a failure to train or supervise is when the frequency of constitutional violations makes it obvious to the municipality that additional training or supervision is necessary.  Id.

Plaintiff fails to meet this exacting standard of establishing municipal liability under a failure to supervise or train theory.  In support of his claim, plaintiff has placed into the record evidence of "widespread strip searches," which according to plaintiff establishes that the District of Columbia was aware of the need for training and supervision.  See Canton, 489 U.S. at 390 n.10 (the frequency of violations makes further training obvious).  Plaintiff cites the deposition testimony of several MPD officers recounting searches they conducted in the course of their law enforcement work.  See Pl. Opp'n at 17-8.  However, the problem with this evidence is that it does not show the existence of unconstitutional searches.  The testimony of Officer Washington, Captain Mario Patrizio, Lieutenant Charity and Sergeants Johnson and Manlapaz regarding the practice and occurrences of "strip searches" does nothing to establish that the searches they testified about were in fact unconstitutional.  Plaintiff certainly cannot and does not contend that every time an officer conducts a search of a suspect, regardless of the manner of the search, it amounts to a constitutional violation.  Plaintiff also cites to newspaper articles that purport to establish the existence of unconstitutional searches.  However, only one of the articles cited by plaintiff discusses a possible unconstitutional search.  See Pl. Opp'n, Ex. E, "Cavity Crawl," Washington City Paper, (August 8, 2003) at 11.  The sum of plaintiff's evidence regarding the volume of unconstitutional searches, then, is one newspaper article discussing an unlawful search, and MPD officers' testimony that searches occur.  The mere fact that police officers

-19-

conduct searches is, however, insufficient to establish that the searches were unconstitutional.  In

Wolfish, the Supreme Court held that strip searches are not per se unconstitutional, and the Court

fashioned a multi-prong test to assess the reasonableness of any such search.  441 U.S. at 559.

The specific facts of each search must be considered before determining the constitutionality of

each search, and therefore the fact that officers conduct "strip searches" tells the Court nothing

about whether the searches are unconstitutional.   Without evidence of unconstitutional searches,

it cannot be said that the District knew or should have known the risk of constitutional violations

without additional supervision or training.  See Baker, 326 F.3d at 1307; Cherrington v. Skeeter,

344 F.3d 631, 646 (6th Cir. 2003) (plaintiff failed to establish similar incidents of

unconstitutional conduct on municipal liability claim).  As a result, plaintiff is left with only his

single alleged unconstitutional search to support a claim of the District's deliberate indifference

through the failure to train, which generally is insufficient to establish municipal liability.  See

Tuttle, 471 U.S. 808, 823-24.

　　　Plaintiff also contends that the evidence establishes that officers do not receive sufficient

supervision in conducting searches.  In support of this contention, plaintiff again cites the

testimony of several MPD sergeants who testified that they did not supervise or train officers in

conducting searches.  See Pl. Opp'n at 19-23.  For example, Sergeant Johnson testified that his

supervisory and training functions in regard to searches of suspects is limited to passing out or

reading general orders.  See Pl. Opp'n, Ex. A, Deposition of Deryl Mark Johnson ("Johnson

Dep.") at 13-15.  Plaintiff also cites the testimony of Lieutenant Charity that he could not recall

having a conversation with Sergeants Johnson and Manlapez about street searches, although he is

sure it would have occurred.  See Pl. Opp'n, Ex. A, Deposition of Paul Charity ("Charity Dep.")

at 16.

Plaintiff also argues that the evidence establishes that most MPD officers do not know the MPD regulations pertaining to strip searches and fail to follow those regulations by obtaining permission before conducting a search and by properly logging searches. Again, plaintiff relies heavily upon the testimony of MPD officers to establish that they were unaware of MPD regulations pertaining to searches and that they failed to follow proper procedures. The evidence seems to establish fairly clearly that many MPD officers are unclear about the specifics of MPD regulations pertaining to searches. For example, it would appear that some officers are unclear as to the exact definition of a "strip search." See Charity Dep. at 70-74 (incorrectly testifying that under MPD regulations a body cavity search could be conducted without a warrant).

The problem with plaintiff's evidence regarding the role of MPD supervisors, and the officers' knowledge of and obedience to MPD regulations, is not the reliability of the evidence, but rather that the evidence is simply insufficient to establish municipal liability. This additional evidence cannot disguise the fact that plaintiff cannot establish the existence of constitutional violations with respect to the searches themselves. Without evidence of actual unconstitutional searches, plaintiff cannot show that D.C. was deliberately indifferent to ongoing violations in failing to provide proper supervision. Plaintiff's evidence regarding the lack of knowledge of MPD regulations also fails to establish municipal liability because MPD regulations are not constitutional standards such that violations can be considered evidence of unconstitutional searches. See Boveri v. Town of Saugus, 113 F.3d 4, 7 (1st Cir. 1997) ("A regulatory violation, like a violation of state law, is not inherently sufficient to support a § 1983 claim.").

Hence, the evidence regarding the lack of supervision and training by MPD sergeants

does not itself establish that additional training and supervision with regard to strip searches was so obviously needed as to excuse the absence of any evidence of widespread unconstitutional searches.  See Canton, 489 U.S. at 390 n. 10 (discussing two instances of municipal liability).  It would be one thing if plaintiff could show that the MPD does not provide any training in strip searches, for then even without further evidence of unconstitutional searches, it might be obvious that training is needed.  See id.  However, there is ample evidence in the record that the MPD does provide some training on conducting constitutionally permissible searches.  See Johnson Dep. at 17-18 (officers are required to undergo a 40-hour training course per year); Allen Dep. at 72, 82-84 (testifying that he received training in searches and arrests at the police academy as well as refresher courses).

Finally, plaintiff's claim of municipal liability fails because he cannot establish the necessary causal link between any alleged lack of training or supervision and the alleged violation of his rights.  See Carter, 795 F.2d at 122; see also McClendon v. City of Columbia, 258 F.3d 432, 442 (5th Cir. 2001) (plaintiff failed to show causal connection between policy and alleged violation).  Even if plaintiff were able to establish deliberate indifference on the part of the District of Columbia (which he has not), plaintiff has not shown the requisite nexus between his specific alleged constitutional violations and any lack of training or supervision.  Indeed, two of plaintiff's claims are that the officers fabricated the POCA violation and that Officer Allen made impermissible sexual contact with plaintiff.   As to these claims, no amount of the type of training plaintiff is urging would likely prevent an officer from committing perjury or sexual assault.  See, e.g., Walker v. City of New York, 974 F.2d 293, 299-300 (2nd Cir. 1992); Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998) (training would not have prevented sexual

assault on inmate).  As to the allegation regarding the public nature of the intrusive search, even

if plaintiff can show a nexus, he still fails to show that, by an objective standard, the District of

Columbia knew or should have known of constitutional violations arising from insufficient

training or supervision.  See Baker, 326 F.3d at 1307.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part defendants' motion

for summary judgment.  A separate order will be issued on this date.


      /s/ John D. Bates
      JOHN D. BATES
      United States District Judge

Dated:  August 15, 2005



Copies to:
Robert A. Jablon
Spiegel & McDiarmid
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
      *Counsel for plaintiff*

Robert DeBerardinis, Jr.
D.C. Corporation Counsel
P.O. Box 14600
Washington, D.C. 20044-4600
      *Counsel for defendants*